Argued February 6, affirmed June 17, 1976

WHELCHEL, *Respondent,*
*v.*
STRANGWAYS et ux, *Appellants.*

550 P2d 1228

*James C. Goode* of Goode, Goode, Decker, Hinson & Ryan, P.C., Albany, argued the cause and filed briefs for appellants.

*Nina E. Johnson,* Eugene, argued the cause for respondent. With her on the brief was Roy Dwyer, P.C.

McALLISTER, J.

## McALLISTER, J.

The plaintiff, Kenneth Whelchel, brought this action to recover damages from the defendant Malcolm H. Strangways and Shirley A. Strangways, his wife, for personal injuries caused by the alleged negligence of the defendants.

The defendants were the owners and operators of the Wren Tavern in the community of Wren, about five miles west of Corvallis. In his amended complaint plaintiff charged the defendants with negligence:

"1. In permitting disorderly conduct on the part of certain persons to take place upon the licensed premises, namely, roughhousing, fighting, and the use of abusive language.

"2. In failing to direct persons to leave the premises and remove persons from its premises after said persons threatened violence to other customers, including the Plaintiff.

"3. In failing to heed warnings of violence and thereafter to take appropriate action to protect customers of the Defendant, including the Plaintiff.

"4. In failing to provide an employe or employees who would maintain proper order and exercise reasonable care for the safety and comfort of its customers."

The jury, by a special verdict, found that the defendants were negligent and that plaintiff was not contributorily negligent. Judgment was then entered for plaintiff and defendants appeal.

■ Defendants first assign as error the denial of their motion for a directed verdict which raised the sufficiency of the evidence to make a case for the jury. Since the jury found for plaintiff we must consider the evidence in the light most favorable to plaintiff.

The Wren Tavern is a small establishment 33 x 28 feet containing, inter alia, a bar, 14 bar stools, and two pool tables, and could accommodate, at the most, about 20 persons.

Although the evidence in some respects is disputed, there was evidence from which the jury could have found the facts hereinafter set out.

During the evening of October 27, 1973, prior to the sequence of events which culminated in the injury to plaintiff, there were 12 to 14 patrons in the bar. The tavern was orderly with no one visibly intoxicated or in any manner abusive. Malcolm Strangways was tending bar and was the only person working.

Sometime between seven o'clock and eight o'clock, p.m., Eldean Booth and Dan Fouts arrived at the tavern, ordered peanuts and beer and began playing pool. Shortly thereafter the plaintiff, Kenneth Whelchel, arrived with the three Spinney brothers and Francis Spinney ordered beer at the bar. Shortly after the arrival of the plaintiff and the Spinney brothers, the following incident occurred, which was described by Booth as follows:

"A. * * * One of the fellows [Darrel Spinney] standing behind the people sitting at the bar was staring at me. I looked at him and apparently I was staring at him. I could tell the agitation was building.

"Q. Was anything said?
"A. There was nothing said.

* * * * *

"Q. What happened next?
"A. I didn't want to have any trouble so I stepped above the bar stool, stepped over to the man [Darrel Spinney] and I told him I didn't want any trouble and he told me there wouldn't be any trouble if I would quit staring at him and I told him I would. We shook hands and I went back to the bar.

"Q. Was anyone else involved in this handshaking besides you and this other person?
"A. Dan came over.

"Q. Dan?
"A. Dan Fouts and the other fellow [the plaintiff] came over and the person I was having the stare down with came. The four of us shook hands and decided it was all over."

Defendant Malcolm Strangways testified he observed this incident from behind the bar.

Booth testified that he returned to his spot near the bar, waiting his turn at the pool table. He testified that when his turn came he began to walk over to the pool table, but was "attacked" by Darrel Spinney. Booth testified that he hit back at Spinney. Francis Spinney then stepped in between the two men and testified that he did so in an attempt to stop the fight. The fight continued, however, with the men moving toward the door to the outside.

There was testimony that when the fight began between Darrel Spinney and Booth the plaintiff Whelchel walked over to where Dan Fouts was standing. Fouts was holding a pool cue by the small end with the butt end resting on his shoulder. The defendant testified that he heard the plaintiff tell Fouts that he "better not use the stick". A witness to the incident between plaintiff and Fouts testified as follows:

> "Kenny [the plaintiff] was at this point [pointing to a prepared diagram], let's see, Kenny was standing here and Fouts was standing here and they were still talking and Fouts raised a cue stick like this as if to hit Kenny. Kenny continued talking and he relaxed the cue stick onto his shoulder and Kenny talked a little bit longer and turned to leave and Fouts raised the cue stick and hit him with the cue stick and Kenny fell in this area here (indicating)."

There was medical evidence that the blow to plaintiff's head caused serious permanent injury.

The jury could have found that from the time Spinney and Booth began fighting until the plaintiff was struck by the pool cue a period of at least three minutes elapsed. There was evidence from which the jury could have found that throughout this entire incident the defendant, Malcolm Strangways, remained behind the bar and took no action to either stop the fight or eject the men from the premises, nor did he

attempt to prevent Fouts from using the pool cue as a weapon in the melee.

The jury could have found that the defendants were negligent if it found that there was sufficient time between the start of the fight and the injury to the plaintiff for the defendant Malcolm Strangways to have taken some affirmative action to stop the fight and to prevent the injury to the plaintiff. Whether Strangways should have attempted to stop the fight, to eject the fighters from the premises, and to prevent Fouts from using the pool cue as a weapon were all questions for the jury. We hold that the court did not err in denying defendants' motion for a directed verdict.

■ Defendants next contend that the court erred in admitting testimony of the conduct of the defendants during other fights and disorderly conduct which had previously occurred on the premises. The following is the testimony objected to, which was elicited from the witness Eckstein:

"MR. DWYER: Q. When these fights occurred, what would Mr. Strangways do, if anything?

"MR. GOODE: Same objection, your Honor. It doesn't have anything to do with this case, what he might have done on previous occasions.

"THE COURT: Objection sustained.

"MR. DWYER: Q. Did you ever see Mr. Strangways on the other side of the bar when the fights occurred?

"MR. GOODE: Same objection, your Honor. He is talking about other times, apparently it's not this case. Where Mr. Strangways positioned himself before has nothing to do with this case.

"MR. DWYER: I think it goes to show, your Honor, control of a crowd when something goes on.

"THE COURT: I will overrule the objection. You may answer.

"WITNESS: A lot of times he didn't want to get involved in them.

"MR. GOODE: Objection. The answer is nonresponsive to the question and it is a conclusion.

"THE COURT: Objection sustained. Ladies and gentlemen of the jury, you are instructed to disregard the answer.

"MR. DWYER: Q. Tell the jury, in other words, when these things happened, when the fights happened, would Mr. Strangways come to the other side of the bar, yes or no?

"A. (No response)

"Q. You can answer. If he objects—he can take care of himself.

"MR. GOODE: Same objection that I have registered before.

"THE COURT: You may have your continuing objection.

"MR. DWYER: Q. You can answer the question.

"A. No, he wouldn't come from behind the bar sometimes.

"Q. During these times was there anybody there to stop the fights who was working for him?

"A. No.

"Q. What had happened to the fights—

"MR. GOODE: Objection, they're not being offered—

"THE COURT: I will overrule the obejction. You may answer.

"WITNESS: A lot of the times he would tell them to go outside to fight and get off the premises."

Defendants contend that the evidence of conduct at other times is not admissible if it has no direct relation to the events in dispute, citing *Karsun v. Kelley,* 258 Or 155, 482 P2d 533 (1971).

The jury could have found, however, from the testimony quoted above, that other fights had occurred in the tavern and that Malcolm Strangways, as bartender, had not taken reasonable precautions to protect the other patrons of the tavern during such disturbances.

The plaintiff contends that the evidence was offered to prove his allegation that the defendants were negligent in failing to provide an employe or

employees to maintain order in the tavern. Plaintiff's position is supported by our holding in *Beecher v. Montgomery Ward & Co.,* 267 Or 496, 501, 517 P2d 667 (1973), where we said:

> "Generally, other conduct or acts of alleged wrongdoing which have no direct relation to the controversy being tried are of insufficient relevance to be admissible. However, in some instances, evidence of other acts similar to those in controversy are admissible to prove plan, scheme and *method of operation* or intent. * * * In such latter situations, the relevance is weighed against the potential irrelevant use that can be made of the information * * *." (Emphasis added.)

In *Karsun v. Kelley* we held that evidence of conduct on other occasions was admissible to show "intent, motive or knowledge." 258 Or at 162 et seq.

The applicable rule is stated in Restatement of Torts 2d, §344, as follows:

> "A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to
>
> "(a) discover that such acts are being done or are likely to be done, or
>
> "(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it."

Comment f is particularly applicable here. It reads as follows:

> "*f. Duty to police premises.* Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor even though he has no reason to expect it on the part of any particular individual. If the place or character of his

business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection."

See, also, *Miller v. Staton,* 58 Wash 2d 879, 365 P2d 333, 336 (1961), where it is said:

"The defendants contend the trial court erred in admitting into evidence, over objections, testimony concerning fights that occurred in defendants' tavern in the fall of 1957. We disagree. One of the issues relating to the exercise of reasonable care for the guests' protection was whether additional policing was necessary on this evening, in view of the defendants' knowledge of the likelihood of boisterous conduct, disorder, and fights on the occasion of a New Year's Eve celebration, with the attendant imbibing of intoxicants. Evidence of conduct of patrons on prior occasions is admissible to show similar conduct could reasonably have been anticipated by the defendants during a subsequent festive evening such as New Year's Eve, which would require policing reasonably adequate for their guests' protection. The objectionable evidence was admissible for this purpose. McCormick on Evidence, § 167 (1954); See *Tonning v. Northern Pac. Ry.,* 1935, 180 Wash. 374, 39 P2d 1002." 365 P2d at 336.

We hold that the court did not err in receiving evidence of the conduct of defendants when prior fights or disorderly conduct had occurred as bearing on the allegation that defendants failed to provide sufficient employees to afford reasonable protection to their patrons. The evidence of Strangways' failure to intervene in prior altercations was relevant to show defendants' knowledge that there would be no intervention unless defendants hired someone for that purpose.

The defendants next contend that the trial court erred in instructing the jury as follows:

"You are instructed that in order to render Defendants liable for the consequences of their acts or omissions to act, it is not necessary that Defendants should

have foreseen in exactly what manner and in which way injury would be inflicted on the Plaintiff. It is sufficient if, in view of all the circumstances, the Defendant, as a reasonably prudent person, operating the Wren Tavern, could have foreseen that his acts or failure to act would probably result in danger of injury to someone."

Defendants contend that the above instruction amounted to giving a directed verdict for the plaintiff, because the jury could have reasonably found that the fight on the premises would result in an injury to someone. We think that defendants' criticism of the quoted instruction is unwarranted. The jury was properly instructed on foreseeability in accord with our holding in *Danner v. Arnsberg,* 227 Or 420, 423, 362 P2d 758 (1961), where we stated:

"* * * [F]oreseeability goes to the question of negligence and asks whether or not the defendant as a reasonable prudent person ought reasonably to foresee that his act or omission would subject his guests to some harm. * * *

"It is not necessary that the defendants anticipate the precise consequences of their act. * * *"

We find no merit in defendants' objection to the instruction quoted above.

■ Defendants finally contend that the court erred in not instructing the jury that in returning the special verdict form the same nine of their number must agree on the answers to all questions in the verdict. It is true that the minimum legal number of jurors required for a valid verdict must be the same jurors who voted similarly on each separate issue which needed resolution. However, defendants in this case were given an opportunity by the trial court to have the jury polled on each separate issue and they declined to ask for such a poll. We hold they thereby waived their right to challenge the validity of the jury verdict.

Since we find no merit in the assignments of error, the judgment of the trial court is affirmed.