563 A.2d 392

**Ann G. WILSON et al.**

v.

**Connie I. MORRIS, Personal Representative of the Estate of Irene Mae Ragland.**

**No. 52, Sept. Term, 1988.**

Court of Appeals of Maryland.

Sept. 12, 1989.

Ralph S. Tyler, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Carmen M. Shepard, Lydia B. Duff, Asst. Attys. Gen., Baltimore, Richard R. Page Wyrough, Farrington, Smallwood & Wells, Landover), all on brief, for petitioner.

Daniel F. Goldstein (Elizabeth M. Kameen, Brown & Goldstein, Baltimore, William Schildt, Strite, Schildt & Varner, Hagerstown), all on brief, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

BLACKWELL, Judge.

In this personal injury case, we evaluate two important issues accepted for certiorari: 1) whether evidence of prior and subsequent policies of a day care center in attending patients is admissible to show a breach of the standard of care and 2) does a juror's statement regarding "the insurance crisis" and the high cost of injury cases establish juror bias so as to warrant a mistrial. We shall affirm the intermediate appellate court's decision remanding the case for a new trial. *Morris v. Wilson*, 74 Md.App. 663, 539 A.2d 1151 (1988).

In March, 1982, Irene Ragland (Ragland), then sixty-seven years old, entered the Western Maryland Adult Day Care Treatment Center for the Chronically Ill and Aging (the Center) because she needed physical therapy, psychiat-

ric counseling and general care. Due partly to a serious back operation, she was physically unable to perform basic personal care. Ragland was unable to bathe herself, to get off the couch without assistance, to walk unassisted or to prepare a meal on her own.[1] On May 6, 1982, a staff member of the Center, Mary Shain (Shain), escorted Ragland in a wheelchair from the Center to the adjacent Washington County Health Department. As part of a care plan, Ragland was taken to the psychiatrist's offices on the second floor. Pursuant to patient monitoring policies in effect at the time of the accident, Ragland was left in the waiting area. Shain notified the receptionist to call her when Ragland was ready to return to the Center.

When the call came to get Ragland, Shain was in a meeting but was informed that the patient was ready to return. Ragland waited approximately fifteen to twenty minutes, then with assistance took the elevator to the first floor receptionist area. Ann G. Wilson (Wilson), the Health Department receptionist on the first floor, apparently offered to wheel her back to the Center. Ragland was left unattended at the top of an inclined sidewalk when Wilson returned to her desk to answer a phone call. Subsequently, the wheelchair rolled down an access ramp for the handicapped resulting in Ragland falling forward onto the pedals of the wheelchair.[2] As a result of the incident, Ragland suffered two fractured vertebrae.[3]

---

1. Myrna L. Binkley (Binkley), the Director of the Center testified that Ragland had problems with: confusion, emotional instability and was limited in her ability to brake her wheelchair. Due to these problems, the staff assessment categorized her as requiring "frequent observation."

2. According to Ragland, the receptionist opened the doors and pushed the wheelchair outside. Wilson contends that Ragland had merely asked her to open the doors, and Ragland was able to maneuver herself forward.

3. Ragland's original suit in the Circuit Court for Washington County named the following as defendants: Myrna Binkley, the Director of the Day Care Center, Mary Shain, who transported Ragland to the Health Department and was responsible for bringing her back to the

From the time the Center was founded until approximately eighteen months before the accident, and again, beginning the day after, the Center's policy was for an attendant to transport, monitor and remain with patients taken to the Health Department for medical care.[4] The trial judge refused to admit the evidence of prior and subsequent practices of the Center. The court also denied plaintiff's motion for mistrial based on alleged juror bias. The trial judge granted a motion for judgment for defendant Shain, and the jury later returned a verdict for the remaining defendants, Binkley and Wilson.[5] The Court of Special Appeals reversed holding both prior and subsequent procedures demonstrate a pattern of conduct that is relevant and admissible. *Morris v. Wilson,* 74 Md.App. at 668, 539 A.2d at 1153–54. On the issue of juror bias, the intermediate appellate court stated, "Although we cannot say at this point whether a mistrial was warranted, the failure of the trial judge to inquire into a serious allegation of juror bias compels us to remand the case for a new trial." *Id.* at 677, 539 A.2d at 1158. For purposes of simplifying our analysis, we shall address the issues in the following order:

1) The admissibility of the prior patient monitoring policy of the Center;

2) The admissibility of the subsequent policy after the accident; and

---

Center and Ann G. Wilson, the Health Department receptionist who allegedly pushed her outside at her request. Subsequent to the filing of the complaint, Ragland died of unrelated causes and Connie I. Morris, her niece and personal representative, was substituted as plaintiff.

4. At the time of the accident, it was the policy of the Center to have an attendant accompany its patients to and from the two adjacent facilities, but not to wait there during the course of treatment. The Health Department receptionist would notify the Center by phone that a patient was ready to return.

5. In response to a special verdict, the jury found the defendants were not negligent and that Ragland was contributorially negligent and/or assumed the risk of injury.

3) Whether the trial judge abused his discretion in refusing to grant the motion for mistrial.

## I.

■ During the course of the trial, plaintiff's counsel sought to introduce evidence that until late 1980 or early 1981, the Center's policy was to have a staff member remain with patients who were taken to the Health Department until their appointments were completed. Plaintiff's counsel expressly proffered to the court that the prior practice of the Center was relevant to show "an awareness of the hazard ..., [it] shows foreseeability before the act and it doesn't discourage corrective action." In the brief of Respondent, Connie I. Morris (Morris), counsel emphasized the prior policy was relevant to establish the applicable standard of care. The argument continued with the following premise: "in connection with the 'reasonableness' of the defendant's conduct, the plaintiff should have been permitted to introduce, not only the fact of the prior policy, but also the reasons it was changed prior to the accident."

Petitioner steadfastly maintained the trial judge did not abuse his discretion in excluding the prior policy. Counsel emphasizes the evidentiary determination should be subject to our typical relevancy analysis, with a weighing of the probative value against prejudicial effect. *See, e.g., Cross v. State*, 282 Md. 468, 474, 386 A.2d 757, 761 (1978). The fact that the Center had a different patient monitoring policy "one and a half to two years prior to plaintiff's accident is simply too remote in time to be probative of the question of whether defendants breached the standard of care on May 6, 1982." We have not previously considered under what circumstances a prior policy or practice is admissible to prove an alleged breach of the applicable standard of care.

When Morris' counsel sought to interrogate Binkley as to the prior patient monitoring policies of the Center, the following colloquy transpired:

Q (Mr. Goldstein): Was it your practice to have patients taken ... who were taken over to the Western ... to the Health Department to have your staff remain while they completed their appointment?

Ms. Johnston: Objection.

The Court: Objection is sustained.

After counsel approached the Bench, the discussion continued:

The Court: For what purpose do you want to approach the Bench?

Mr. Goldstein: Well, to the extent that the issue here is one of a prior practice. While I'm aware that Ms. Johnston in a Motion in Limine has challenged subsequent practice, we would urge that the prior practice is fully admissible on the issue of standard of care, on the issue of feasibility.

The trial judge sustained the objection stating:

Well, Mr. Goldstein, I disagree with you. I just don't think that any prior practice before 1982 or whatever, 1980 has any relevance to an accident that happened in 1982....

The assessment of the admissibility of the prior practice of the Center should be subject to traditional relevancy principles. Generally, "evidence which is relevant to a material issue is admissible, except as otherwise provided by statute or by rules applicable in Maryland courts." 5 L. McLain, *Maryland Practice: Maryland Evidence* § 402.1, at 294 (1987).

In *Kennedy v. Crouch*, 191 Md. 580, 62 A.2d 582 (1948), we set forth the following central relevancy principles to be applied in civil cases: "[i]t is an elementary rule that evidence, to be admissible, must be relevant to the issues and must tend either to establish or disprove them, and evidence which does not tend to describe or explain the facts and circumstances of the case is inadmissible." *Id.* at 585, 62 A.2d at 585; *Haile v. Dinnis*, 184 Md. 144, 152, 40 A.2d 363, 367 (1944) ("All facts having rational probative

value are admissible, unless some specific rule forbids.'') (quoting Wigmore, *Evidence* § 10, at 293 (3d ed. 1940)).

"For an item of evidence to be admissible, it must be both relevant and material. Evidence is material if it tends to establish a proposition that has legal significance to the litigation. Evidence is relevant if it is sufficiently probative of a proposition that, if established, would have legal significance to the litigation." *Paige v. Manuzak*, 57 Md.App. 621, 632, 471 A.2d 758, 763 (1984) (quoting 1 Wigmore, *Evidence* § 2 (Tillers rev. 1983)).

As otherwise stated, "Evidence is relevant if it has any tendency to make [the] existence of a material fact more probable or less probable than it would be without the evidence. A material fact is a fact that is of legal consequence to the determination of the issues in the case." 5 L. McLain, *supra*, § 401.1, at 261; C. McCormick, *Evidence* § 185, at 541 (E. Cleary 3d ed. 1984) (McCormick identifies the second aspect of relevance as "probative value," which is the tendency of evidence to establish the proposition that it is offered to prove.). As stated by Professor McLain in her treatise, "what issues are material to a particular case is determined by the pleadings and the substantive law." 5 L. McLain, *supra*, at 262 (other citations omitted).

We agree with the Court of Special Appeals' conclusion that "absent some rule against its admission, the evidence of prior policies would be admissible as long as it was relevant, competent, and material." *Morris v. Wilson, supra*, 74 Md.App. at 676, 539 A.2d at 1157. We similarly find no statute, rule, or other authority which would prescribe the inadmissibility of prior practices as a matter of law. The trial court's determination as to the admissibility of the Center's prior policy in monitoring patients depends upon whether the evidence is more or less likely to establish the standard of care required of the Day Care Center.

The record lacks any reference to generally accepted standards in the day care industry. No expert testimony was provided by either party. Here, the jury was asked to

determine the reasonableness of the defendant's patient monitoring policy on the basis of their common sense appraisal of the facts allowed into evidence. We do not conclude, however, that a jury could not determine the reasonable duty of providing an attendant to one in Ragland's condition under the circumstances of this case.

The trial judge's conclusion that the evidence of prior procedures was too remote, and therefore irrelevant, was based primarily on the fact it was discontinued approximately eighteen months prior to the accident. Since this is an issue of first impression in Maryland, we turn to other jurisdictions' analyses for guidance.

In *Welsh v. Burlington Northern R. Co.*, 719 S.W.2d 793 (Mo.App.1986), plaintiff sought damages for personal injuries suffered on May 23, 1977, while employed as a journeyman electrician for the St. Louis–San Francisco Railway. Plaintiff was manually lifting a propane gas tank onto a receptacle on one of defendant's business cars. He sustained permanent injuries to the lumbar spine. Plaintiff alleged defendant failed to provide a reasonably safe work environment. As part of the case-in-chief, plaintiff provided evidence that the company had previously supplied employees with carts for the purpose of loading the propane tanks. This policy was abandoned in the late 1960's. Defendant argued that the admission of such evidence "interjected a false standard into the lawsuit—whether there were safer tools or methods of work which might have been used."

The Missouri Court of Appeals held:

We find that the testimony regarding the defendant's previous use of carts to load propane tanks on business cars, the requests made by employees to foremen to provide carts for the purpose of loading propane tanks and the testimony regarding the capability of defendant's own fabricating shop to construct the requested carts was relevant and probative on the issue of whether defendant was negligent in failing to provide reasonably safe equipment for its employees' use.

*Id.* at 797. The appellate court further reasoned: "It cannot be said that the use of a cart to load propane tanks onto business cars was unknown to the defendant at the time of plaintiff's accident because in the past carts had been used by defendant for loading the propane tanks onto business cars." *Id.*[6]

In *Papastathis v. Beall*, 150 Ariz. 279, 723 P.2d 97 (1986), the decedent was injured while shopping in a "7–11" store in Phoenix, Arizona. Upon entering the store, he went to a cooler dispenser rack and bent down to make a selection. At the same time, an employee was loading soft drink cans into the cooler. Decedent was struck on the back of the head, and later died the result of a ruptured intracranial aneurysm. Decedent's widow brought a wrongful death action alleging negligence, naming as defendants the franchisee and Southland Corporation. Southland voluntarily undertook the responsibility of inspecting, endorsing and recommending the rack to be furnished by Coca Cola Company for use in franchisee stores.

Defendant Southland argued on appeal "that it was prejudiced by the introduction into evidence of alternative rack designs that were allegedly safer than the design of the Coca Cola racks." *Id.* at 100. In affirming the admission of the evidence of other rack designs, the Court of Appeals of Arizona reasoned:

> Southland correctly states that the measure of its negligence is not whether the racks chosen were the safest possible, but whether they exercised reasonable care in selecting the racks. This does not mean, however, that the evidence of the alternative rack designs was irrelevant. The alternative racks were clearly probative of

---

**6.** The *Welsh* court also noted, "The question of alternative methods are facts to be considered by the jury in determining whether or not the method used by defendant was reasonably safe and whether or not other methods could have been easily adopted." *Id.* at 796–97, citing *Clark v. Widmer Engineering Co.*, 263 S.W. 500, 501 (Mo.App. 1924).

Southland's negligence in selecting the particular rack in light of the fact that safer designs were available.
*Id.* at 100.

*Swiler v. Baker's Super Market, Inc.,* 277 N.W.2d 697 (Neb.1979), involved a personal injury case in which plaintiff was seriously injured when she tripped and fell upon an entrance floor mat in defendant's store. The evidence revealed that, on wet and rainy days, it was defendant's usual practice to tape the mat to the floor to protect against slipping. The defendant had failed to secure the mat on the day of the accident. Plaintiff testified she later noticed bunching or bulging of the end of the mat. The Supreme Court of Nebraska ruled the trial court properly allowed the plaintiff to introduce evidence, over the defendant's objection, relative to the store owner's past practice of taping or securing the mat in question in order to prevent bulging. *Id.* at 700.

Finally, in *Whelchel v. Strangways,* 275 Or. 297, 550 P.2d 1228 (1976), Whelchel was injured permanently in a bar room brawl. Plaintiff sued the owners and operators of the tavern alleging, in part, that the tavern's employee was negligent in failing to maintain order, and in not taking any corrective action as the altercation erupted. The Supreme Court of Oregon held the trial court properly admitted evidence of the conduct of defendants when prior fights or disorderly conduct had occurred. This was relevant "as bearing on the allegation that defendants failed to provide sufficient employees to afford reasonable protection to their patrons." *Id.* at 1232.

We conclude the trial court erred in excluding the evidence of the Day Care Center's prior patient monitoring policy, which was in effect approximately eighteen months before the incident. In this case, the fact that the Center had a specific prior policy of remaining with patients taken for medical care is relevant for the jury's consideration of the appropriate standard of care. While the earlier policy does not in and of itself establish reasonable standards under these circumstances, it is probative in revealing the

Center's knowledge and perception of its duty to patients. Counsel should also be allowed to interrogate Binkley regarding the reasons for the change in policy. The responses would have a tendency to make it more or less probable that the patient monitoring policy in effect at the time of the incident was reasonable under the circumstances. The evidence is also relevant to demonstrate the feasibility of other precautionary measures.

■ The determination of whether the Center's patient monitoring policy at the time of the accident was reasonable is a question of fact for the jury. In the present case, the evidence of the prior policy is a material fact to be considered in analyzing whether the current policy used by the Center was reasonably safe or whether other methods could have been easily adopted. We do not mean to imply that prior policies of a health care provider are always admissible.

The trial judge should generally consider:
1) The remoteness in time of the prior policy;
2) The degree and significance of the change in relation to the substantive issues presented;
3) The reasons for the change in policy; and
4) The likelihood that any prejudicial effect of the proffered evidence will outweigh the probative value of the evidence.

Here, we find the age of the prior policy is not a central consideration, and that the jury would be assisted with the presentation of the past patient monitoring practices of the Center in determining the reasonableness of the Center's care of Ragland under the circumstances of this case.

## II.

At trial, Respondent separately attempted to introduce evidence regarding the Center's immediate readoption of the patient monitoring procedure after Ragland's accident. This policy required staff members to remain with patients taken to the Health Department during the course of their

medical appointments. The trial judge declined to admit the proffered evidence. The following colloquy occurred during the direct examination of defendant Binkley:

Q. (Mr. Goldstein): Now, directing your attention to the very next day, May 7, 1982, did you make any changes in the policy that you had previously followed with respect to whether or not patients were accompanied at all times at the Health Department?

Ms. Johnston: Objection.

The Court: Objection is sustained.

Mr. Goldstein: Your honor, I'd ask leave to address this one as well.

The Court: It's not necessary, Mr. Goldstein. Objection is sustained.[7]

Under the Maryland common law, "when remedial measures are taken following an accident, injury, or event for the purpose of making the event less likely to recur, evidence of those remedial measures is not admissible as an *admission* of negligence, culpable conduct, or liability in connection with the event." 5 L. McLain, *Maryland Practice: Maryland Evidence* § 407.1, at 407 (1987, 1989 Supp.) (emphasis added). "Maryland ostensibly follows the common law rule." *Id.* at 407–08; *see, e.g., Long v. Joestlein,* 193 Md. 211, 220, 66 A.2d 407, 411 (1949).[8] The scope of the

---

**7.** This evidentiary ruling was consistent with the trial judge's decision finding the prior conduct to be inadmissible.

**8.** The general common law rule excluding evidence of subsequent remedial measures is codified in Rule 407 of the Federal Rules of Evidence as promulgated by the Supreme Court effective July 1, 1975. The text of Rule 407 provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Fed.R.Evid. 407.

rule is broad and includes evidence of subsequent remedial measures such as repairs, changes in procedure, changes in material or personnel, and other precautionary actions made after an event. *Id.* (footnote omitted); *see generally* C. McCormick, *Evidence* § 275 (E. Cleary 3d ed. 1984). It is clear that subsequent conduct evidence may not be received as *admissions* of negligence or culpability.

In her brief, Respondent contends the subsequent policy regarding supervision of patients was admissible for the jury's consideration of the applicable standard of care owed to Ragland. On the other hand,

> Defendants' [petitioners'] position is that because the admission of postaccident remedial measures involves the admission of highly prejudicial evidence and runs counter to the policy of encouraging repairs to avoid future accidents, an appellate court should be acutely sensitive, indeed highly deferential, to a trial judge's determination to exclude such evidence.

In essence, the issue here becomes whether subsequent policy evidence is admissible to prove the scope of the duty of care owed to the plaintiff, or is it admissible for other valid grounds.[9]

---

The advisory committee's note to Federal Rule 407 specifies two policy grounds for the rule:

1) The conduct is not in fact an admission, since [it] is equally consistent with injury by mere accident or through contributory negligence.

2) The other, and more impressive, ground for exclusion rests on a social policy of encouraging people to take, or at least not discouraging them from taking steps in furtherance of added safety.

Maryland recognizes an additional theory in support of the general rule of exclusion on the ground that taking remedial measures is not probative of the actor's fault. 5 L. McLain, *Maryland Practice: Maryland Evidence* § 407.1, at 408 (1987, 1989 Supp.). The issue of whether Maryland should adopt the substance of Federal Rule 407 in its entirety has not been conclusively determined. This is a matter appropriate for initial consideration by the Code of Evidence Subcommittee, Standing Committee on Rules of Practice and Procedure.

**9.** The advisory committee's note to Federal Rule 407 expressly lists "existence of duty" as a separate valid basis for admitting evidence of subsequent remedial measures.

We have recognized a "standard of care exception" to the general rule excluding subsequent remedial measures which "provides circumstantial proof that the applicable standard of care had not been met at the time of the accident or other occurrence in question." McClain, *supra* at 410. We shall review our prior holdings discussing the standard of care exception and relate them to this case.

In *American Paving & Con. Co. v. Davis*, 127 Md. 477, 96 A. 623 (1916), plaintiff's home was partially destroyed by fire allegedly caused by sparks emitting from a steam shovel operated by defendant. The trial judge there allowed the jury to consider evidence of the defendant's conduct after the fire regarding the placement of a wire hood or screen over the smokestack. This change resulted in a great reduction in the emission of sparks. In concluding the evidence tended to show negligence on the part of defendant, we reasoned:

> The mere fact that the defendant or its servants after the fire put a wire hood or screen over the smokestack would not be admissible for the purpose of establishing an admission of liability by the defendant, ... but evidence of the effect of the screen was admissible as reflecting upon the question whether the defendant had exercised proper care and caution to avoid injury to the plaintiff's property.

*Id.* at 483–84; 96 A. at 626.

Later in *Blanco v. J.C. Penney Co.*, 251 Md. 707, 248 A.2d 645 (1967), plaintiff-appellant was seriously injured after walking through and shattering a glass panel door in defendant's store. At the time of the incident, the panel was clear of any markings or material which would indicate the presence of the glass. Plaintiff sought to admit testimony that approximately two weeks after the injury defendant pasted decals on the doors. Counsel proffered the evidence was admissible on the issue of "whether Penney had exercised proper care and caution to avoid causing injuries such as those sustained by the appellant." *Id.* at 709, 248 A.2d at 647. Based on the reasoning in *Davis*,

*supra,* we concluded the defendant's postaccident conduct was admissible. *Id.* at 710, 248 A.2d at 647. *See generally Becker Pretzel Bakeries, Inc. v. Universal Oven Co.,* 279 F.Supp. 893 (D.Md.1968); *Jennings v. United States,* 207 F.Supp. 143, 148, aff'd 318 F.2d 718 (4th Cir.1963) (Evidence of deepening of drainage ditch after accident was admissible to show "whether defendant had exercised proper care and caution.").

In *Ramsey v. D.P.A. Associates,* 265 Md. 319, 289 A.2d 321 (1972), a four year old boy was seriously injured when a glass door collapsed on him. The door was framed in metal and had a push bar approximately four feet off the ground. The child was 32 inches tall at the time of the accident. Subsequent to the incident, a second push bar was attached "at child's level." His father instituted a negligence cause of action and sought to admit evidence of the later installation of the lower level bar. At the end of the Plaintiff's case, the trial judge directed a verdict for defendants, the apartment owners. We affirmed, reasoning:

The fact that the appellees placed a bar at child height across the door subsequent to the accident is, as argued by appellees in their brief, of no more significance as evidence of negligence than if they had replaced the door with a solid walnut door. There was no evidence in this case that the landlord had any notice of any dangerous characteristics of the glass door. There was no evidence that the glass failed to measure up to some accepted standard. There was no evidence that a bar of child height was the norm or standard expected for such doors. In short, appellants presented no evidence of negligence on the part of the appellees.

*Id.* at 319, 289 A.2d at 324. *Ramsey* essentially holds that evidence of subsequent remedial measures is not legally sufficient in and of itself to prove negligence. This reasoning is not applicable in the context of the present case.

Finally, in *Hagan v. Washington Suburban Sanitary Commission,* 20 Md.App. 192, 314 A.2d 699 (1974), the Court of Special Appeals held that evidence that a hydrant

was moved after an accident was not legally sufficient to establish the defendant's "prior knowledge that a hazard may have existed." *Id.* at 197–98, 314 A.2d at 702. The court was particularly concerned with the improper use of the subsequent safety measures, and stated: "such evidence cannot be used as an admission of liability, it cannot give birth to a hazard where none exists, nor impart a knowledge that is otherwise absent." *Id.* at 198, 314 A.2d at 702–03.[10] In the present case, we are not concerned with a question of the sufficiency of the evidence. Secondly, the duties of care mentioned in *Hagan*, such as knowledge of a hazard, are not applicable. We are not persuaded that *Hagan* should be interpreted as limiting the admissibility of subsequent conduct evidence where the standard of care is directly at issue.

The "standard of care exception" to the general exclusionary rule identified in *American Paving* and *Blanco* has been criticized by one commentator as follows: "[such] evidence provides circumstantial proof that the applicable standard of care had not been met at the time of the accident or other occurrence in question. It also provides indirect proof of causation. In effect, this exception 'swallows the rule.' " McLain, *supra* at 410 (footnote omitted).[11] We are unpersuaded by this commentary and decline to limit the use of the standard of care exception. Maryland's common law approach does not specifically track Federal Rule 407. The Maryland common law generally supports the principle that subsequent conduct evidence should not

---

**10.** The *Hagan* court did recognize two permissible purposes for the evidence: " 'to show who had actual control over the plug and to show what was feasible to correct the condition prior to the accident.' It cannot, however, now serve to fill the evidentiary void of appellee's knowledge of the existence of a latent danger prior to the accident." *Id.* at 199, 314 A.2d at 703.

**11.** McLain specifically refers to *American Paving* and *Blanco* as permitting proof of remedial measures to show its "helpful effect." We interpret these cases as providing for a general rule allowing for evidence of subsequent conduct to show the appropriate standard of care required at the time of the incident.

be received as an *admission* of negligence or liability. The standard of care exception is currently Maryland law and we apply it in the present case.

 The burden of establishing proper grounds for admitting subsequent conduct evidence is upon the party seeking to admit the evidence of the subsequent conduct. Here, however, the trial judge did not allow Morris' counsel the opportunity to argue or to proffer the appropriate reasons for admitting the subsequent policy evidence. It is understandable under these circumstances that the record lacks any reference to Maryland's standard of care exception or to other permissible purposes for admission of the subsequent policy evidence. The court stated on the record that it was unnecessary to hear counsel on the matter. It is apparent that the trial judge's ruling was intended to be consistent with the earlier ruling excluding evidence of the prior policy of the Center. This foreclosure by the trial judge unfairly precluded counsel from making a valid proffer of the purpose for the evidence.

Accordingly, we rule that the trial judge erred in precluding counsel from offering the proper grounds for which the subsequent conduct evidence should be admitted. Although a jury should not consider the evidence of the immediate change in patient monitoring policies as an *admission* of negligence or culpability, it is admissible as evidence of the standard of care required under the circumstances. It is relevant to the jury's consideration of the scope of the Center's duty of care owed to Ragland. The fact that the Center readopted its prior patient monitoring policy the day after, and as a direct result of the incident, is probative evidence of the Center's perception of its duty of care owed to patients.

Consistent with our analysis, and assuming the trial judge admits the evidence under the standard of care exception on retrial, it would then be appropriate that the court

give an instruction limiting the use of remedial measures evidence to the permissible purpose.[12]

### III.

■ Turning to the alleged juror bias, Morris' mistrial motion was based entirely on counsel's proffer that prior to jury selection, she overheard a conversation of a person subsequently selected as a juror stating "these cases are costing too much money" and need to be stopped. The conversation allegedly occurred in the courthouse hallway. Morris failed to recognize the person who made the statement until sometime after he stepped into the jury box and was sworn as a member of the jury. Morris did not communicate her concerns to counsel until the parties were on their way to a bus to view the accident scene. This delay in communication was likely the result of Morris, a layperson, not realizing the significance of the venire person's comments. At the commencement of the trial, it is understandable that Morris did not have the presence of mind to fully formulate her concerns until a recess occurred.

After a lunch recess, Morris' counsel sought a mistrial on the basis of the presence of the juror. No alternate jurors had been seated. The mistrial motion arose after:

(1) the jury had been impaneled and sworn;
(2) three opening statements were presented, and
(3) the court, the parties and the jury had viewed the scene of the accident.

Defendants maintained that the objections were untimely, and that Morris waived her right to challenge the juror for cause. Focusing on the timing of the motion, the trial judge denied the motion for mistrial and reasoned:

---

**12.** It would also be proper to instruct the jury that the subsequent policy evidence is only admissible against defendant Binkley. The changes in monitoring policies did not effect Wilson, an employee of the Health Department. *See Morris v. Wilson, supra,* 74 Md.App. at 668 n. 3, 539 A.2d at 1153 n. 3.

Well, you have your motion on the record, Mr. Shildt, but I am going to deny it because the jurors have all taken their oath; and before they took their oath, all parties were asked if they had any exception to the jury as empanelled and the Plaintiffs, as well as all defendants, said that they had no such exceptions to the jury as empanelled; so that I do not believe [an] uncorroborated alleged statement concerning jury verdicts generally warrants a mistrial, in face of the jury having taken their oath to well and truly try this case....

In reversing and remanding the case for a new trial, the Court of Special Appeals ruled that it was reversible error for the trial judge to fail to conduct *voir dire* to determine if that juror could put aside his personal bias and render a fair and impartial verdict. "We believe that once an allegation of patent juror bias was raised through the motion for mistrial, the judge could not simply rely on the fact that the statements were uncorroborated." *Morris v. Wilson,* 74 Md.App. at 679, 539 A.2d at 1159. The intermediate appellate court concluded that plaintiff had exercised due diligence in asserting the bias claim. *Id.* We essentially agree with the conclusions of the Court of Special Appeals on this point.

 Maryland Rule 2–512(e) expressly provides that a challenge for cause may occur after the jury is sworn "for good cause shown." [13] In analyzing whether there has been a waiver of the right to present a good cause challenge, it is appropriate to focus on when counsel knew of the grounds for such an objection. Here, Morris' counsel acted on the first available opportunity, out of the jury's presence, to advise the court of the alleged bias of the juror after being apprised of the statement by his client. Counsel immediately informed the judge of the juror's comments after the

---

**13.** In its entirety, Md.Rule 2–512(e) states:
 **Challenge for Cause.**—A party may challenge an individual juror for cause. A challenge for cause shall be made and determined before the jury is sworn, or thereafter for good cause shown.

lunch recess. The plaintiff's presentation of the case in chief had not commenced. Nothing had yet occurred in the courtroom that presaged the probable outcome of the case. Generally, a waiver of the right to object must occur voluntarily with the requisite knowledge and intent. *See, e.g., Benson v. Borden*, 174 Md. 202, 219, 198 A. 419, 427 (1938). Upon our review of the record, there is neither an indication that Morris intentionally or unreasonably delayed in communicating her concerns to counsel nor evidence of a lack of due diligence in raising the issue of juror bias.

■ In *Bristow v. State*, 242 Md. 283, 287, 219 A.2d 33, 36 (1965), we recognized that a challenge for cause may be considered after the commencement of the trial where the cause for challenge is not reasonably known at an earlier time.

Under the circumstances presented, we agree with the Court of Special Appeals that the trial judge had a duty to conduct *voir dire* of the juror prior to ruling on the motion for mistrial. This function was imperative in determining whether "good cause" existed sufficient to support the allegation of juror bias. The trial judge had an affirmative obligation to inquire whether the juror could nonetheless render a fair and impartial verdict.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.

COSTS TO BE PAID BY PETITIONERS, ANN G. WILSON, ET AL.

McAULIFFE, Judge, concurring in part and dissenting in part.

I concur in the result. I agree with the Court's holding in Part III of the opinion, and thus I agree that the case must be remanded for a new trial. I disagree, however, with Parts I and II of the majority opinion.

In Part I, the majority holds that the trial judge abused his discretion in refusing to admit, as a part of plaintiff's case-in-chief, evidence of a practice once followed by the Center, but discontinued one and one-half to two years before this accident. I disagree with that holding. Ordinarily, evidence of a policy or regulation of a defendant regarding the performance of a certain act is admissible when the plaintiff shows the policy or rule was in effect at the time of the accident, but was not followed on that particular occasion. *See* 3 F. Harper, F. James, and O. Gray, *The Law of Torts* § 17.3 at 587–88 (2d ed. 1986). That is not the case here. Conceivably, the evidence may have been admissible to rebut a contention by the defendant that it was not feasible to provide someone to accompany the patient at all times, but I do not understand that such a contention had been made in this case. At best, this evidence was admissible only in the exercise of the wide discretion of the trial judge, and I see no error in his refusal to admit it.

I also disagree with the majority's holding in Part II of the Court's opinion. The so-called "standard of care" exception to the usual rule of exclusion of evidence of subsequent conduct is unsound, and should be jettisoned in favor of the better reasoned approach of Federal Rule of Evidence 407. If evidence of subsequent conduct is always admissible on the issue of the amount of care required of a defendant under the circumstances, then there is no rule of exclusion because that issue is always present in a negligence case. The exception does indeed "swallow the rule." L. McLain, *Maryland Evidence,* § 407.1 at 410 (1987). The federal approach does not preclude the introduction of evidence of remedial measures. Rather, it reasonably restricts the admissibility of such evidence to those situations when it is needed, i.e. "when offered for another purpose such as providing ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." Fed.R.Evid. 407. I would adopt that approach for prospective application at the required retrial of this case.