670 A.2d 986

**OWENS–CORNING FIBERGLAS CORPORATION**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE CITY.**

**No. 1995, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Jan. 31, 1996.

Mark Snyderman and Mark A. Perry (Gibson, Dunn & Crutcher, Washington, DC, Drake C. Zaharris and Hodes, Ulman, Pessin & Katz, P.A., on the brief), Towson, for appellant.

Alani Golanski (Stanley J. Levy, Jordan C. Fox, Levy Phillips & Konigsberg, R.L.L.P., New York City, Neal M. Janey, City Solicitor, Otho M. Thompson, Deputy City Solicitor, Carl E. Tuerk, Jr. and Cooper, Beckman & Tuerk, LLP, on the brief), Baltimore, for appellee.

Argued before MURPHY and SALMON, JJ., and JAMES S. GETTY, Judge (Retired) Specially Assigned.

SALMON, Judge.

The Mayor and City Council of Baltimore (City), appellee, filed this lawsuit in 1984 against numerous defendants, including appellant, Owens–Corning Fiberglas Corporation (Owens–Corning), to recover the costs of discovering, maintaining, and removing asbestos-containing products installed in City buildings between 1957 and 1972. The City asserted claims of negligence, strict liability, and breach of express and implied warranties. Prior to trial, the Circuit Court for Baltimore City split the action into three separate proceedings, grouped according to product type. This appeal is from the Group II trial, involving thermal insulation products.

The Group II trial began on January 4, 1993. By the end of the trial, only appellant, Owens–Corning, and Keene Corporation (Keene) remained as defendants. The jury found in favor of Owens–Corning and Keene on the negligence claim, and in favor of the City on its strict liability and breach of implied and express warranty claims. The jury awarded the City $4,448,665.04 in compensatory damages against Keene and Owens–Corning. In addition, the jury awarded $2,600,000 in

punitive damages against Owens–Corning. An award of punitive damages was also made against Keene, but Keene subsequently filed for bankruptcy and is not a party to this appeal. After a motion for new trial was denied, Owens–Corning filed this timely appeal. It presents the following questions, which have been re-phrased and re-ordered for clarity:

1. Did the trial judge err in denying Owens–Corning's motion for judgment on the issue of punitive damages?

2. Did the trial judge commit reversible error by failing to grant a new trial based on juror Delores Torbit's misconduct?

3. Did the trial judge err in ordering Owens–Corning to produce certain documents?

4. May punitive damages be awarded in a non-intentional tort case involving only property loss?

5. May an award of punitive damages stand against Owens–Corning in light of the jury's conflicting verdict that Owens–Corning was not negligent in failing to test for or warn of the dangers of its product?

## I. PUNITIVE DAMAGES

Owens–Corning, a Delaware corporation, is primarily engaged in the business of manufacturing and distributing fiberglass insulation products. It acquired, in 1953, the distribution rights to asbestos-containing Kaylo pipe and boiler insulation from Owens–Illinois Glass Company (Owens–Illinois).[1] Kaylo is a heat insulation product made in both block and molded form. In 1958, Owens–Corning bought the Kaylo manufacturing process from Owens–Illinois and then began to manufacture and sell the Kaylo product. Asbestos-containing Kaylo (sold by Owens–Corning) was installed in numerous City buildings between 1957 and 1972.

---

1. Owens–Corning and Owens–Illinois were separate and distinct entities at all times relevant to this case. They have been autonomous since approximately 1949.

Owens–Corning changed the Kaylo manufacturing process in 1972 and began to manufacture asbestos-free Kaylo. No asbestos-containing Kaylo was installed in City buildings after 1972. Pursuant to Environmental Protection Agency (EPA) regulations, the City forbade custodial workers from working with asbestos materials after 1979. The City, at the time it instituted suit in 1984, planned to repair, remove, and maintain the asbestos in their buildings in order to protect ordinary users of City buildings. Those users included librarians, library users, school teachers, students, and others who worked in and used City buildings but who did not directly handle asbestos products. The City sought recompense for the cost of repair, maintenance, and removal from Owens–Corning and other defendants.

Owens–Corning contends that the trial judge erred in denying its motion for judgment regarding the claim for punitive damages. In addressing the merits of that contention, we find three recent product liability cases to be of particular importance, viz: *Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992); *U.S. Gypsum v. Baltimore,* 336 Md. 145, 647 A.2d 405 (1994); and *ACandS, Inc. et al. v. Godwin,* 340 Md. 334, 667 A.2d 116 (1995). All three cases discuss, *inter alia,* punitive damage issues and concern defendants who manufactured or supplied asbestos. The following principles, relevant to the issue here presented, are:

1. Proof of negligence alone, no matter how gross, wanton or outrageous, is not sufficient to prove punitive damages. *Zenobia, supra,* 325 Md. at 463, 601 A.2d 633; *Godwin, supra,* 340 Md. at 360, 667 A.2d 116.

2. In order to justify a punitive damage award in a non-intentional tort case, a plaintiff must prove that the defendant acted with actual and not just implied malice. *Zenobia, supra,* 325 Md. at 460, 601 A.2d 633; *U.S. Gypsum, supra,* 336 Md. at 188, 647 A.2d 405.

3. To prove actual malice in a products liability case, plaintiff must prove: a) that the defendant *actually* knew of the defective and dangerous condition of the

product at the time it left the defendant's possession or control, *and* b) "armed with this actual knowledge, the defendant consciously or deliberately disregarded the potential harm to consumers." *Zenobia, supra,* 325 Md. at 462–63, 601 A.2d 633; *U.S. Gypsum, supra,* 336 Md. at 188, 647 A.2d 405; *Godwin, supra,* 340 Md. at 361, 667 A.2d 116. Phrased differently, plaintiff must prove "a bad faith decision [on defendant's part] to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer." *Id.*

4. Actual knowledge includes a defendant's willful refusal to know or become aware of the defective nature of its product. *Zenobia, supra,* 325 Md. [at] 462 n. 23, 601 A.2d 633. "[C]onstructive knowledge," "substantial knowledge," or "should have known," however, does not constitute the actual knowledge required to support a punitive damage award. *Godwin, supra,* 340 Md. at 360, 667 A.2d 116.

5. The actual knowledge component has a temporal element. Plaintiff must prove that, at the time the asbestos left the control of the defendant, the defendant actually knew that the asbestos-containing product "presented a serious health risk to" consumers. *U.S. Gypsum, supra,* 336 Md. at 188, 647 A.2d 405. Proof of post-sale knowledge is not sufficient. *Id.* at 190 n. 22, 647 A.2d 405; *Godwin, supra,* 340 Md. at 360, 667 A.2d 116.

6. Courts, when examining "actual knowledge" evidence, are required to make risk distinctions. Proof, for instance, that asbestos was known to be dangerous to a narrow class of unprotected persons in occupational settings is insufficient to prove actual knowledge when the persons potentially endangered were not within that class. *U.S. Gypsum, supra,* 336 Md. at 188–89, 647 A.2d 405.

7. Actual malice, to justify an award of punitive damages, must be proved by clear and convincing evidence. *Zen-*

*obia, supra,* 325 Md. at 469, 601 A.2d 633; *U.S. Gypsum, supra,* 336 Md. at 188, 647 A.2d 405.

8. To meet the "clear and convincing burden," plaintiff must persuade the trier of fact "that the truth of a contention is not merely probable but highly probable." *Godwin, supra,* 340 Md. at 374 n. 11, 667 A.2d 116.

In sum, to be entitled to punitive damages against Owens–Corning, the City was required to prove by clear and convincing evidence that

1) before the last date asbestos-containing Kaylo was supplied by Owens–Corning to a City building, Owens–Corning had actual knowledge that its product, when installed in City buildings, presented a serious health risk to ordinary users of those buildings, and

2) armed with this knowledge, Owens–Corning consciously or deliberately proceeded to market Kaylo in bad faith, disregarding the potential harm to ordinary users.[2] *Zenobia, supra,* 325 Md. at 463, 601 A.2d 633.

## A. OVERVIEW

As of 1972, it was generally recognized "that exposure to asbestos of high enough intensity and long enough duration [was] causally related to asbestosis and cancers." *Godwin, supra,* 340 Md. at 366, 667 A.2d 116, quoting the U.S. Secretary of Labor's promulgation (in 1972) of the first non-emergency asbestos dust standard, 37 Fed.Reg. 11,318. As stated

---

**2.** The City was required to meet an identical two-pronged test in *U.S. Gypsum, supra,* which concerned the Group I portion of the City's suit in this case. The Group I portion involved the sale and distribution of asbestos-containing surface treatment products. The *U.S. Gypsum* Court stated, 336 Md. at 188, 647 A.2d 405:

To recover on its punitive damage claim, the City was required to show that Asbestospray [defendant] actually knew, during the relevant period of time, that its asbestos-containing fireproofing presented a serious health risk to ordinary building users.... The City was further required to prove that, armed with this knowledge, Asbestospray proceeded to market its fireproofing product in bad faith."

in *Godwin, supra,* 340 Md. at 365, 667 A.2d 116, between the late 1950's and 1972

a respectable body of opinion considered that asbestos-caused disease, principally asbestosis, could generally be avoided if dust in the work environment could be kept below a certain limit, the threshold limit value (TLV). One of the groups holding that view was the American Conference of Governmental Industrial Hygienists (ACGIH). It was not a governmental body, but was composed primarily of local, state and federal health officials. ACGIH had begun to issue TLVs in 1946. B. Castleman, *Asbestos: Medical & Legal Aspects,* at 257 (3d ed. 1990) (Castleman). Drawing in part on what some states had been using as a maximum allowable concentration, ACGIH chose a TLV for asbestos of five million particles of dust per cubic foot (MPPCF). *Id.* This is a measurement of dust of all kinds. "Though it may sound like a high concentration, 5 MPPCF of dust in air is not even visibly dusty." Castleman at 250. For comparison purposes, Castleman refers to the reported analysis of air samplings taken in the courtrooms of a courthouse in Rochester, New York in 1935 where the dust levels were measured at 30–43 MPPCF. *Id.* & n. 54. In 1968 and in 1970 ACGIH published notices of an intended change, under which the safety standard for asbestos would measure exposure to asbestos fibers, but ACGIH's TLV was not officially changed until ... [July 7, 1972, when] an OSHA standard was [first placed] in effect. *Id.* at 271.

In 1972, it was generally recognized that asbestos was not a health hazard if exposure could be kept below a certain level. *Godwin, supra,* 340 Md. at 366, 667 A.2d 116. The dispute in 1972 concerned how to best determine a

specific level below which exposure is safe. Various studies attempting to establish quantitative relations between specific levels of exposure to asbestos fibers and the appearance of adverse biological manifestations, such as asbestosis, lung cancers, and mesothelioma, have given rise to controversy as to the validity of the measuring techniques used and the reliability of the relations attempted to be estab-

lished. Because of the long lapse of time between onset of exposure and biological manifestations, we have now evidence of the consequences of exposure, but we do not have, in general, accurate measures of the levels of exposure occurring 20 or 30 years ago, which have given rise to these consequences. There are also controversies concerning the relative toxicity of the various kinds of asbestos, and varying hazards in different workplaces.

*Godwin, supra,* 340 Md. at 366, 667 A.2d 116 (quoting 37 Fed.Reg. 11,318).

### B. *THE CITY'S PROOF OF OWENS–CORNING'S KNOWLEDGE PRIOR TO DECEMBER 31, 1972*

An Owens–Corning intra-company memo dated January 7, 1942 suggested that Owens–Corning should gather a file of existing medical literature discussing the hazards posed by asbestos. The file would be kept as a "weapon-in-reserve" for possible use in a public relations battle Owens–Corning was waging with the Asbestos Workers Union. In 1942, workers in the insulation industry were demanding wage premiums for working with Owens–Corning fiberglass materials because of health concerns. Due to this threat, and because Owens–Corning did not then manufacture or distribute asbestos-containing products, Owens–Corning planned to use its medical literature file to promote dissension among the membership of the Asbestos Workers Union by alerting them to the dangers of asbestos.

The memorandum stated that Owens–Corning was in possession of

two bibliographies covering medical literature to 1938, citing references to scores of publications in which the lung and skin hazards of asbestos were discussed. This file would cover five or six hundred pages, which can be microphotographed in the library of the Surgeon General in Washington or in some other medical library.

It is unclear, however, from the record presented to us, exactly what was said in the 600 pages of literature or whether this was ever used by Owens–Corning.

An internal Owens–Corning memorandum, sent in December 1943, discussed the possibility of mixing fiberglass and asbestos. The memo noted certain hazards of exposure to asbestos, such as asbestosis (an incurable and progressive lung disease). It did not mention the Kaylo product specifically but concerned asbestos generally. The memorandum stated:

> *Admixture with Asbestos.* In formulating our policy on admixture with asbestos, we should keep on the alert because otherwise *we will run the risk of smearing Fiberglas with the hazards of exposure to asbestos.*
>
> Fabrication of asbestos (in both textile and non-textile forms) is a dusty process, and exposure to asbestos fly involves the danger of asbestosis, a pathological lung condition somewhat like silicosis. This hazard is minimized by use of hoods and exhaust systems and wearing of respirators. The Asbestos fabricating industry has learned by the hard way how to control it. More significant, fabrication of textile asbestos involves a skin hazard. To this handling asbestos yarns in carding, drafting, twisting and plying operations and in warping and weaving—whatever the material may pass through the fingers at high speed—may acquire skin lesions known as "asbestos corns" caused by the embedding of the snake-like asbestos fiber into the skin.
>
> The asbestos manufacturing industry is well acquainted with these hazards, and its workers are conditioned to them and are supplied with adequate protective devices. It follows that any extensive Fiberglas asbestos cloth manufacturing program might well be subcontracted to establish asbestos fabricators. Such a course would avoid our having to set up asbestos fabricating facilities of our own and would *prevent exposing our people to such hazards* which might adversely affect our compensation ratings and disability experiences. My suggestion is therefore that the handling of asbestos in

combination with Fiberglas be dissociated from our own manufacturing.

(Emphasis added.)

Owens–Corning committed itself to an effective corporate health program by at least 1943. A December 1943 memorandum stated that, since its inception, the health program had been built on five premises: maintaining awareness of medical and scientific data concerning health aspects of its products; getting this information published in the medical literature; making these facts available to employees of Owens–Corning and to the general public; handling all bona fide health inquiries promptly and fully; and cultivating and maintaining contacts with professional and technical groups knowledgeable about product hazards. In accordance with the 1943 memorandum, a former officer of Owens–Corning testified that Owens–Corning considered it important to know the facts about the possible hazards of products that the company manufactured and distributed.

An article was published in the June 1944 issue of *Heating and Ventilating,* in which Owens–Corning advertised. The authors reported that workers in the insulation industry, asbestos cloth industry, and other similar industries were commonly exposed to asbestos hazards. The authors stated that "[n]o minimal safe concentrations [of asbestos dust] have yet been set up...." The author conceded, however, that information was scant as to the conditions in those plants where hazards were known to exist.

In the 1940's and 1950's, Saranac Laboratory conducted studies for Owens–Corning's predecessor, Owens–Illinois, on the effects that Kaylo dust had on animals. The investigations revealed that the dust was capable of producing a condition typical of asbestosis. A November 1948 letter sent by Saranac Laboratory to Owens–Illinois stated that Kaylo was capable of producing asbestosis and therefore must be regarded as a potentially hazardous material.

A 1952 letter to Owens–Illinois reiterated that Kaylo dust could produce a condition typical of asbestosis and warned

that "every precaution should be taken to protect workers against inhaling the dust."

When Owens–Illinois sold its Kaylo division to Owens–Corning in 1958, the aforementioned letters were boxed and turned over to Owens–Corning. The City did not establish what became of these boxes after shipment, nor did the City establish whether Owens–Corning employees actually read the contents. It was established that, prior to Owens–Corning's acquisition of the Kaylo line, Owens–Illinois employees worked with Owens–Corning employees to advise them about the Kaylo product, but no evidence was presented by the City to show specifically what Owens–Illinois told Owens–Corning.

Prior to Owens–Corning's purchase of the Kaylo division, a letter was sent in 1956 by the director of the Saranac Laboratory for the Study of Tuberculosis, Occupational Disease, and Industrial Hygiene to the director of Personnel and Industrial Relations at Owens–Corning. The letter stated, "I suppose you already know that asbestos is fairly well incriminated as a carcinogen and the [sic] asbestos causes lung damage...."

The City proved that Owens–Corning did indeed know of this danger. For instance, John Thomas, vice-president of Owens–Corning Research and Development in the mid–1960's and later its president and chief operating officer, testified at trial that he was aware by 1955 that Kaylo was potentially dangerous because it had asbestos in it.

Dr. David Ozonoff, chairman of the Department of Environmental Health at the Boston University School of Public Health, testified that by 1960 the scientific community generally accepted the fact that asbestos was associated with mesothelioma, an aggressive and deadly form of cancer.

A September 1963 internal memorandum sent by the Owens–Corning Product Development Laboratory discussed the health risks of several insulation products, including Kaylo. The memo stated, "Asbestos (as found in Kaylo) when breathed into the lungs causes asbestosis which often leads to lung cancer."

Several case studies were introduced by the City in an attempt to show when Owens–Corning acquired knowledge of the dangers of asbestosis. Dr. Ozonoff told the jury about a 1932 case study of a hospital maintenance worker who contracted moderate to severe asbestosis. Dr. Ozonoff stated that, to his knowledge, this was the earliest known case in which a worker in a building that contained asbestos contracted the disease of asbestosis. This case was noted in a published report of a November 1932 conference entitled "The Effects of Dusts upon the Respiratory System." The conference, held in Chicago, was not specifically devoted to asbestos illness but addressed effects of all nuisance dusts affecting workers. Dr. Ozonoff related that the relevant portion of the case study stated:

[T]his is the X-ray of a man who had or has asbestosis. His occupation was that of cleaning and restoring the asbestos on pipes in one of our government hospitals.

He had been working at the trade about six years, I think, and you will see he has fibrosis of both lungs.... He had disability, and the government compensated him for it.

The report did not provide any information as to the worker's prior work or health history. Moreover, there was no proof that this case study or other such studies were widely distributed or that Owens–Corning otherwise had knowledge of these case studies at any time here relevant.

In 1964, Dr. Irving Selikoff, a respected researcher in the field of occupational health, published a landmark article in the Journal of the American Medical Association. This 1964 article discussed the incidence of asbestosis and asbestos-related disease in workers exposed to asbestos under industrial conditions. The study found that the death rate for certain types of cancer was much higher among asbestos industry workers than among the general population. This article was known to Owens–Corning no later than May 7, 1964.

The 1964 Selikoff article also hypothesized about the possibility of health problems associated with minimal exposure to asbestos, including environmental cancer. The study men-

tioned the possibility of environmental exposure to persons who lived near asbestos mines or manufacturing plants but did not mention the risk of in-place asbestos to ordinary building users. Dr. Selikoff noted that "floating [asbestos] fibers do not respect job classifications...." He opined that "insulation workers undoubtedly share their exposure with their workmates in other trades; intimate contact with asbestos is possible for electricians, plumbers, sheet-metal workers, steamfitters, laborers, carpenters, boilermakers, and foremen; perhaps even the supervising architect should be included."[3]

Well before 1972, Owens–Corning was aware that asbestos caused asbestosis among its own employees who worked in plants where Kaylo was manufactured. Over 100 such cases of asbestosis were reported between 1958 and 1972.

Owens–Corning internal correspondence discussed replacing asbestos as the reinforcing agent for Kaylo before 1972. A memorandum written in October 1966 by an Owens–Corning marketing division employee urged that, because of health hazards, Owens–Corning "should again investigate the use of other reinforcing materials in Kaylo." A June 1967 memorandum showed that Mr. D.W. Ladd of the marketing division was cognizant of serious concerns over the potential health hazards of Kaylo. Mr. Ladd suggested that the lab focus on improving the structural stability of Kaylo. He did not, however, urge the product lab to accelerate its effort to find a replacement for asbestos in the Kaylo product.

An Owens–Corning memorandum written in May 1969 said, "Let's get rid of asbestos in the insulation industry.... This should be our number one research program at this time...."

## C. *OTHER EVIDENCE*

Although several pre–1972 memoranda mentioned the hazardous nature of asbestos, none addressed concerns about

---

3. Dr. Ozonoff testified that a 1948 public paper from the National Cancer Institute discussed asbestos as a cause of environmental cancer. This reference is unhelpful, however, because Dr. Ozonoff did not describe this paper in further detail, and there was no proof that Owens–Corning had any knowledge of it.

dangers to persons exposed to in-place asbestos, such as ordinary building users.

One of the City's expert witnesses, Dr. Arthur Frank, chairman of the Department of Preventive Medicine in Environmental Health at the College of Medicine at the University of Kentucky, testified that no studies existed before 1972 concerning whether building occupants, such as teachers, students, or librarians, were exposed to any health hazards due to the presence of in-place asbestos. Such studies were not available until 1987. Defense experts agreed. For instance, Dr. Edward Gaensler testified on behalf of Owens–Corning that he was not aware of any studies before 1987 examining the incidence of asbestos-related disease in persons whose only exposure came as a building occupant.

In regard to what is presently known about the hazards of exposure to in-place asbestos, Dr. Frank testified that maintenance workers may dislodge asbestos-containing materials accidentally during the course of routine repairs, and "we think that, again, these peak exposures [caused by disturbing asbestos-containing products], which can occur irregularly, . . . may be of particular concern." Dr. Frank further testified that post 1972 studies have reported cases of mesothelioma in teachers, where the teachers' only known exposure to asbestos was as building occupants.

David Mayer, former manager of the EPA's national asbestos technical assistance program, testified that maintenance personnel face exposure to hazardous levels of asbestos through their normal work of cleaning and working around asbestos-containing materials. He did not testify as to when this information was either generally known or when it was known by Owens–Corning.

The City introduced evidence that routine repairs conducted by building maintenance workers prior to 1979 often exposed them to asbestos materials such as Kaylo.[4] The record does

---

4. As previously noted, City building maintenance workers did not handle asbestos after 1979. Accordingly, they are not among the

not disclose when Owens–Corning first gained knowledge of this fact.

Studies published in 1987 and 1988, including one by appellee's expert, Dr. Christine Oliver, director of occupational and environmental medicine at Massachusetts General Hospital, showed that the incidence of scarring of the lungs and restriction of breathing function of school custodians was strongly associated with the duration of work as a school custodian in buildings where there was asbestos-containing materials.

## D. *DISCUSSION*

The City clearly and convincingly proved that, prior to 1972, Owens–Corning actually knew that Kaylo was a product that was dangerous at certain levels to particular classes of individuals who were exposed to its dust. Those classes included asbestos miners and installers, asbestos insulators, and persons in the asbestos manufacturing process. Owens–Corning knew that the danger posed to persons in these occupations was of contracting cancer or asbestosis. The City also proved that, prior to 1972, Owens–Corning never warned consumers of the dangers of asbestos. In this appeal, the major issue is whether the City presented sufficient evidence to show that Owens–Corning, prior to 1972, had actual knowledge of the serious risk posed by in-place asbestos to ordinary building users.

The City established that studies published after 1972 showed that exposure at certain levels to in-place asbestos posed serious health hazards to ordinary building users. The City's evidence, however, was insufficient to show such pre–1972 knowledge. As the Missouri Supreme Court noted,

Only by superimposing the twenty-twenty hindsight of regulatory law, medical science and technology arising after 1972 can one infer knowledge of any danger to KCI employees and patrons that would require removal of the product.

"ordinary building users" the City sought to protect by filing this action, in 1984, to request recompense for the cost of discovering, maintaining, and removing the asbestos.

The evidence again is insufficient to show that defendant had knowledge of the defect and danger to KCI employees and patrons which in turn formed the basis of plaintiff's damages. The trial court correctly sustained the motion for judgment notwithstanding the verdict regarding the punitive damages claim.

*Kansas City v. Keene Corp.*, 855 S.W.2d 360, 376 (1993). This statement applies with equal force to the case *sub judice*.

To support its punitive damage claim, the City relies, *inter alia*, on *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 980 (4th Cir.1987). That case involved a suit by a municipality to recover its economic loss resulting from the installation of asbestos-containing products in City buildings.

The City states in its brief that the *W.R. Grace* Court "has stressed [that] a jury may draw a proper legal inference concerning the risks associated with exposure to asbestos at relatively low levels in buildings by extrapolating from data showing the risks associated with high levels of exposure." This is not precisely accurate. What the court actually said was that experts may legitimately draw inferences regarding the risks of low level exposure to asbestos to ordinary building users by extrapolating from data showing that high level exposures to asbestos caused serious health risks.[5] 827 F.2d at 980. Significantly, the Court did not say that a jury may infer actual knowledge on the part of a defendant based upon such an inference.

In *W.R. Grace*, the Court applied South Carolina law and held that the municipality was entitled to punitive damage. South Carolina has a more relaxed punitive damage standard than does Maryland. It allows for the recovery of punitive damages when a tortfeasor acts willfully, wantonly, or in reckless disregard of the rights of another. *Id.* at 983.

---

5. It should be recalled that this was not the inference that was drawn by many knowledgeable persons prior to 1972. As noted in *Godwin, supra,* prior to 1972 a respectable body of opinion existed that asbestos-related diseases could be avoided if asbestos dust was kept below certain threshold limits. 340 Md. at 365, 667 A.2d 116.

This standard was essentially the pre-*Zenobia* test in Maryland. *See Smith v. Gray Concrete Pipe Co.*, 267 Md. 149, 167, 297 A.2d 721 (1972) (employing standard of "[w]anton or reckless disregard for human life") (citations omitted).

In *Montgomery Ward v. Wilson*, 339 Md. 701, 664 A.2d 916 (1995), the Court of Appeals flatly rejected an attempt to prove actual malice by inference. In the *Wilson* case, a plaintiff in a malicious prosecution suit asserted that she had proven that Montgomery Ward had acted with actual malice by her proof that the store had instituted a criminal action without probable cause. The *Wilson* Court stated that "[p]ermitting a wrongful motive to be inferred from a lack of probable cause is not consonant with th[e], 'clear and convincing' standard of proof" required for a submissible punitive damage claim. *Wilson, supra,* 339 Md. at 735, 664 A.2d 916. The Court further held, "Although the jury may draw an inference of such motive from lack of probable cause for purposes of compensatory damages, it may not rely on the inference in considering punitive damages." *Id.,* 339 Md. at 735–36, 664 A.2d 916.

In *Keene, supra,* the Missouri Supreme Court applied a punitive damages standard analogous to that used in Maryland.[6] 855 S.W.2d at 374–75. Appellant Kansas City sued Keene for the cost of removal of asbestos from City facilities. It proved that Keene knew that asbestos dust posed serious health hazards to certain classes of individuals exposed to it. Kansas City introduced a study in which Dr. Selikoff, in 1970, warned the asbestos industry but not *Keene* directly, that asbestos products *might* contaminate large areas both in and around treated buildings *after* the material was in-place. *Id.* at 374–75. The Missouri Supreme Court said:

---

6. In Missouri, a plaintiff is entitled to a punitive damage award if it establishes that defendant's conduct in selling its product was outrageous because an evil motive or reckless indifference to the rights of others. *Keene Corp.*, 855 S.W.2d at 374. "Punitive damages may be awarded only where the defendant knew of the defect and danger of the product and, by selling the product, showed complete indifference to or conscious disregard for the safety of others." *Id.*

*Evidence of a generalized knowledge that asbestos poses a danger to a narrow class of unprotected persons who are exposed during the application or removal of asbestos-containing materials in buildings will not, under the strict requirements for a submissible punitive damages case, support an inference that [defendant] had knowledge of a danger to the much broader class of person who were merely present in such buildings at other times.* The evidence of knowledge of the danger to unprotected construction workers is insufficient to establish that Keene exhibited a complete indifference or conscious disregard to the safety of KCI employees or patrons using the terminals.

*Id.* at 375 (emphasis added). The italicized portion of *Keene* was quoted with approval by Judge Eldridge, for the Court, in *U.S. Gypsum v. Baltimore, supra,* 336 Md. at 188–89, 647 A.2d 405, in the following context:

The City argues that it has "clearly and convincingly . . . met the requirements for punitive damages set forth in *Owens–Illinois v. Zenobia.*" To recover on its punitive damages claim, the City was required to show that Asbestospray *actually knew, during the relevant time period, that its asbestos-containing fireproofing presented a serious health risk to ordinary building users. See Kansas City v. Keene Corp., supra,* 855 S.W.2d at 375 ("Evidence of a generalized knowledge that asbestos poses a danger to a narrow class of unprotected persons who are exposed during the application or removal of asbestos-containing materials in buildings will not, under the strict requirements for a submissible punitive damages case, support an inference that [defendants] had knowledge of a danger to the much broader class of persons who were merely present in such buildings at other times"); *Sch. Dist. of Independence v. U.S. Gypsum Co., supra,* 750 S.W.2d at 446 ("To make a submissible case for punitive damages, the School District was required to produce evidence that USG had actual knowledge of the product Audicot's propensity to release asbestos fibers"); *Catasauqua Area School Dist. v. Raymark Industries, Inc., supra,* 662 F.Supp. [64,] at 70

*(knowledge of the risks of constant occupational exposure to asbestos was insufficient to prove outrageous behavior in an action for the costs of asbestos removal).*

(Emphasis added.)

As plainly shown by *U.S. Gypsum, supra*, risk distinctions must be drawn. Proof that Owens–Corning knew, prior to 1972, that high levels of exposure to asbestos were dangerous to asbestos trade workers does not support the inference that it also knew before 1972 that lower dose exposure was similarly dangerous to ordinary building users.

The City also argues that it was entitled to have the jury consider punitive damages because Owens–Corning (allegedly) engaged in fraud. This claim is based on the fact that in 1953 Owens–Corning, as part of their promotion of Kaylo, provided the City with a brochure dealing with the Kaylo product. The brochure said, in part:

Few materials have been so thoroughly tested [as Kaylo]. Owens–Illinois began work on hydrous calcium silicates in 1938, but no material was offered to the general market until 1943. Thousands of installations since that time have proved field superiority, yet research and product development are still continuing.

Kaylo Heat Insulation is made both as block and as molded pipe insulation, with the widest range of sizes, forms and thicknesses of any high temperature insulation available. Kaylo hydrous calcium silicate combines the most desirable physical characteristics of heat insulating materials to a degree not equalled by other materials on the market. This means outstanding performance and economical application for the user.

\* \* \* \* \* \*

### APPLICATION

With a weight of only *11 pounds per cubic foot,* handling, shipping and application are simplified. (Emphasis in original.)

Kaylo IIcat Insulation has flexural strength, compressive *strength and resistance to abrasion far above normal requirements* for heat insulation. Breakage during installation, therefore, is usually negligible. (Emphasis in original.)

Block or pipe insulation *can be cut, scored or sawed with ordinary tools* of the trade. (Emphasis supplied.) *The material is non-irritating to the skin and non-toxic.* (Emphasis in original.)

The City seizes on the last sentence in the above quoted passage and claims that Owens–Corning knew from tests (performed prior to 1953) of "Kaylo's extreme toxicity." We disagree.

 Fraud has a temporal element. To be fraudulent, a statement must be known to be false when it is communicated to another. Non-toxic means non-poisonous.[7] In 1953, Owens–Corning had just begun to distribute Kaylo for Owens–Illinois. It did not then manufacture Kaylo. There was no proof that in 1953 Owens–Corning was aware of any test indicating that Kaylo (as opposed to raw asbestos or asbestos contained in other products) was toxic. Thus, fraud was not proven.

The City also points out that while Owens–Corning knew, prior to 1972, that researchers had established no absolute safe level of asbestos exposure, it nevertheless failed to warn ordinary building users of this fact. The City impliedly argues that actual malice can be inferred from such a failure to warn. It cannot. While it is true that no safe level of exposure had been established, this did not mean that Owens–Corning (or anyone else) knew during the relevant time period that *all* exposure to asbestos dust posed a significant health risk. In fact, the general belief was to the contrary. As pointed out in *Godwin, supra,* 340 Md. at 365, 667 A.2d 116, it was "generally believed" prior to 1972 that significant health risks "could generally be avoided if dust in the work place"

---

7. *Webster's Encyclopedia Dictionary of the English Language* 1500 (1989), defines toxic as "pertaining to, affected with or caused by a toxin or poison; poisonous."

could be kept below certain limits. This belief was evidenced by the Walsh–Healey Public Contract Act in 1969 (34 Fed. Reg. 7949, 7953) and the OSHA Standards for exposure to asbestos, which first became effective on July 7, 1972, in 37 Fed.Reg. 11,318. *Godwin, supra,* 340 Md. at 365, 667 A.2d 116.

### E. SUMMARY

To be entitled to punitive damages, the City was required to prove, *inter alia,* that prior to 1972 Owens–Corning actually knew that its product, once installed in City buildings, posed a significant health risk to ordinary users of those buildings. In determining whether actual knowledge has been proven, risk distinctions must be recognized. Proof that Owens–Corning had actual knowledge prior to 1972 of the risk of asbestos exposure to a more narrow class of persons who were more directly or more intensely exposed to asbestos dust does not suffice to prove that Owens–Corning had actual knowledge of a serious risk of contracting asbestos-related diseases by ordinary building users.

The City also failed to prove that Owens–Corning wilfully refused to know or become aware of the asbestos risk to ordinary building users. The evidence established, without contradiction, that prior to 1972 no studies had been published showing that ordinary building users, in buildings containing in-place asbestos, had a significant risk of contracting an asbestos-related disease. Furthermore, there was no proof that this fact was otherwise known to Owens–Corning. For the above reasons,[8] the trial judge erred when he denied Owens–Corning's motion for judgment on the punitive damage portion of appellant's claim.

---

8. The City also failed to meet the second prong of the punitive damage test applicable in a product liability case, i.e., armed with actual knowledge that the product was dangerous to ordinary building users, Owens–Corning consciously and deliberately proceeded to market Kaylo in bad faith.

## II. *DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY FAILURE TO GRANT A NEW TRIAL BASED ON JUROR DELORES TORBIT'S MISCONDUCT?*

Delores Torbit was one of the six jurors in this case. She was an employee of the Internal Revenue Service (IRS). Except for a two-week hiatus in March 1993, Ms. Torbit regularly served as a juror in this case from January 4 to June 25, 1993. During this period, jurors served four days per week; they never served on Fridays, except once during deliberation. At regular intervals during the trial, Ms. Torbit was given workslips by the court clerk, which listed the dates that she had served as a juror. These workslips were to be given to Ms. Torbit's employer as verification that she had performed jury service on the dates shown on the slips.

In early June 1993, it came to the attention of the IRS that Ms. Torbit may have falsified her workslips by changing them to show that she had regularly served on Fridays when she had not. On June 4, 1993, Kevin Davies, an IRS inspector, questioned a clerk in the Jury Division of the circuit court about Ms. Torbit's jury-service schedule. The clerk told Mr. Davies that, because the trial was still in progress, he should direct any questions he had regarding Ms. Torbit's jury service to the trial judge.

The jury returned its verdict awarding the City compensatory damages on June 23, 1993. It then began to hear additional evidence on the issue of punitive damages.

On June 24, 1993, IRS Agent John Wanat had a brief telephone conversation with the trial judge. He told the judge that he was looking into "potential allegations" that Ms. Torbit may have been altering her jury workslips. He stated that he could not say definitely, at that point, whether the slips had been altered. The judge told Agent Wanat that the jury was in deliberation; that he had not handled those slips; that the slips had been signed by the court clerk; and that Mr. Wanat should contact the court clerk to verify the dates when Ms. Torbit had served.

The trial judge did not bring the telephone conversation with Mr. Wanat to the attention of counsel, and on June 25, 1993, the jury returned its punitive damage verdicts.

In July 1993, the IRS opened a formal investigation as to whether Ms. Torbit had altered her workslips. It contacted the court clerk and confirmed that Ms. Torbit had falsified her workslips to show that she had regularly served on Fridays.

On September 10, 1993, counsel for Owens–Corning learned, for the first time, that Delores Torbit had been under investigation by the IRS for falsifying her jury-service record. Three days later, on September 13, 1993, the court held a hearing on Owens–Corning's motion for new trial. At that hearing, Owens–Corning's counsel brought up the issue of Ms. Torbit's misconduct. The Court granted, at Owens–Corning's request, a seven-day extension so that counsel could investigate the juror-misconduct issue.

On September 20, 1993, after defense counsel had interviewed Agent Wanat, Owens–Corning moved for a new trial and argued that Ms. Torbit had "demonstrated her lack of probity and inability to uphold the law at the very time she was sworn to do so." Owens–Corning also argued that the trial court, after being informed on June 24, 1993 of the allegations regarding Ms. Torbit's misconduct, had an obligation either to remove her from the jury "*sua sponte* or to notify the litigants of the circumstances and determine" their position as to whether she should continue to serve as a juror. Owens–Corning further argued that, if they had been made aware during the trial of the IRS investigation, they would have,

at the very least, moved to stay all proceedings in order to get to the bottom of the matter. On the basis of information imparted to this Court by Mr. Wanat in [sic] June 24, [Owens–Corning] would undoubtedly have moved to strike Ms. Torbit from the panel. If the court had denied such a motion under those circumstances, its denial would constitute a clear abuse of discretion.

The trial judge observed that there were "mere allegations" against Ms. Torbit on June 24, 1993. No formal charges or indictments were pending against her on that date; "there [was] no evidence of anything [indicating] that the jury's deliberations were tampered with;" and therefore, it "would have been wrong" to remove her as a juror. Accordingly, the court denied Owens–Corning's motion for a new trial.[9]

## A. *Failure to Conduct Supplemental Voir Dire*

 Owens–Corning argues: 1) Because it was not advised of the June 24, 1993 phone call from the IRS agent, it was unable to ask for supplemental *voir dire;* [10] 2) because it was denied this right, it could not challenge for cause; 3) had a challenge for cause been made, the court would have been required to discharge Ms. Torbit as a juror; and 4) accordingly, reversible error was committed.

 "The great purpose of the right of challenge is to secure a fair and impartial trial." *Alexander v. Grier & Sons Co.*, 181 Md. 415, 419, 30 A.2d 757 (1943). A challenge for cause may be made after the commencement of a trial where the cause was not reasonably known to the defendant at an earlier time. *Bristow v. State*, 242 Md. 283, 287, 219 A.2d 33 (1966).

Owens–Corning relies, *inter alia*, on *Morris v. Wilson*, 74 Md.App. 663, 539 A.2d 1151 (1988), *aff'd*, 317 Md. 284, 563 A.2d 392 (1989), in which the plaintiff overheard a juror say that "these cases are costing too much money." 317 Md. at 302, 563 A.2d 392. The plaintiff informed her counsel of this

---

9. After the new trial was denied, Delores Torbit was charged with theft and altering public records based on her alterations of the workslips. Following a jury trial in the Circuit Court for Baltimore City, she was convicted of altering public records. On April 5, 1994, Ms. Torbit received a three-year suspended sentence and was placed on probation for one year. Ms. Torbit appealed her conviction. The conviction was affirmed in a *per curiam* decision of this Court dated December 12, 1994 (*Torbit v. State of Maryland*, 102 Md.App. 799).

10. Owens–Corning does not specify what they contend the trial judge should have asked Ms. Torbit if he had propounded additional *voir dire* questions.

statement, and counsel made a motion for mistrial, which the trial court denied. *Id.* We reversed, stating, "When such an allegation of personal juror bias was disclosed only after the juror was sworn, it was incumbent on the judge to conduct *voir dire* to determine if that juror could put aside his personal bias and render a fair and impartial verdict." *Morris, supra,* 74 Md.App. at 680, 539 A.2d 1151. The Court of Appeals affirmed and adopted the same reasoning. 317 Md. at 303–04, 563 A.2d 392.

*Wilson* is inapposite. It was not shown that Ms. Torbit harbored any bias against Owens–Corning or that she could not render a fair and impartial verdict. Her misconduct had nothing to do with her conduct as a juror; it concerned, instead, what she communicated to others about the length of her jury service.

A trial judge "is vested with particularly broad discretion in deciding whether to *voir dire* a jury to ascertain juror misconduct." *Braxton v. Faber,* 91 Md.App. 391, 411 n. 9, 604 A.2d 543 (1992). In *Braxton,* a party contended that the jurors were guilty of misconduct because they discussed the case during trial in contravention of the court's instructions. Appellant requested that the judge *voir dire* the jury, but the court refused. The *Bristow* Court set out the definition of an impartial jury:

> "[A]ll that can be required of a juror is that he should be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and render a verdict thereon without regard to any former opinion or expression existing in his mind."

*Id.* at 289, 219 A.2d 33, *quoting Garlitz v. State,* 71 Md. 293, 300, 18 A. 39 (1889). We further stated, "Although individual *voir dire* of the jurors might have resolved any question of possible juror misconduct . . . the decision of the trial court [not to do so] does not . . . amount to a plain abuse of discretion, resulting in palpable injustice." *Id.* at 411, 604 A.2d 543. We likewise hold that there was no abuse of discretion or palpable injustice and thus the trial judge did not err in failing to conduct supplemental *voir dire.*

## B. *Failure to Grant a New Trial*

Appellant also contends that the court should have granted a new trial based on Ms. Torbit's misconduct. The grant or denial of a motion for a new trial is committed to the discretion of the trial judge. *Eades v. State*, 75 Md.App. 411, 419, 541 A.2d 1001, *cert. denied*, 313 Md. 611, 547 A.2d 188 (1988). This discretion extends to matters concerning juror misconduct or other irregularities that may affect the jury. *Eades*, 75 Md.App. at 420, 541 A.2d 1001 (citing *Walker v. Hall*, 34 Md.App. 571, 591, 369 A.2d 105 (1977)). The exercise of trial court discretion when ruling on a motion for new trial generally will not be disturbed. *Mack v. State*, 300 Md. 583, 600, 479 A.2d 1344 (1984), *cited in*, *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 54–60, 612 A.2d 1294 (1992) (tracing the history of Maryland appellate review of a lower court's grant or denial of a motion for new trial). *See also Eades*, 75 Md.App. at 420, 541 A.2d 1001 (stating that a ruling upon a motion for new trial will not be disturbed on appeal except for the most extraordinary and compelling reasons).

Owens–Corning did not demonstrate any extraordinary or compelling reasons requiring the grant of a new trial. Ms. Torbit was not aware of the charges against her until after she and the other jurors returned their verdicts. The investigation into her alleged alteration of public records could have had no possible bearing on her capacity to evaluate fairly the evidence presented.[11]

Owens–Corning asserts that the presence on the jury of one who is actively committing forgery is worse than the presence

---

11. Appellant directs our attention to *State v. Cook*, 338 Md. 598, 659 A.2d 1313 (1995), to support its argument that the trial judge committed reversible error. In *Cook*, the Court of Appeals held that the trial court did not abuse its discretion when it removed a juror at the close of all evidence and substituted an alternate. *Id.* at 601–05, 659 A.2d 1313. The Court of Appeals stated that the record reflected the trial court excluded the juror because that juror could not follow the Court's instructions. *Id.* at 616–17, 659 A.2d 1313. In dismissing the juror, the trial judge stated that he had "a serious question in [his] mind whether this particular juror ha[d] followed the instructions that he

of a convicted forger. Her presence, it argues, violates the principle that jurors be good and true. The Maryland Annotated Code addresses this issue and resolves it against Owens–Corning. Courts and Judicial Proceedings Article Section 8–207(b), in pertinent part, provides that one is not qualified to sit on a jury if a person:

(5) Has a charge pending against him for a crime punishable by a fine of more than $500, or by imprisonment for more than six months, or both, or has been convicted of such a crime and has received a sentence of a fine of more than $500, or of imprisonment for more than six months, or both, and has not been pardoned;

(6) Has a charge pending against him for, or has been convicted of, an offense punishable under the provision of § 8–401(c) of this title.... [12]

To be qualified as a juror, one need not have lived a blameless life, nor must a juror be "good." Mere suspicion that a person has committed a crime does not disqualify that person from jury service. While a juror need not be good, he

---

[had been] given ... specifically [to] *keep an open mind throughout the entire case."* *Id.* at 604, 659 A.2d 1313 (emphasis added). Apparently, Owens–Corning contends that Ms. Torbit's alteration of her jury service slips properly necessitates her removal because she also cannot follow instructions. *Cook* is inapplicable because Ms. Torbit did not disobey the court's instructions. In any event, the trial judge in *Cook* was concerned with more than whether the juror could adequately follow directions; he doubted whether the juror was capable of providing a fair evaluation of the case. *Id.* at 605, 659 A.2d 1313. "[W]here ... a trial judge has excused a seated juror and replaced that juror with an alternate based on proper reason that is particular to that specific juror ... we will give deference to this determination and will not reverse absent a clear abuse of discretion or prejudice." *Id.* at 620, 659 A.2d 1313. Neither will this Court substitute its judgment for the trial court's determination that Ms. Torbit's conduct did not affect the jury's deliberations.

12. Section 8–401(c) reads:

*Misrepresentation of facts on juror qualification form.*—A person who willfully misrepresents a material fact on a juror qualification form for the purpose of avoiding or securing service as a juror is subject to a fine of not more than $500 or imprisonment for not more than 30 days.

or she must possess two essential virtues: 1) be without bias or prejudice for or against any litigant; 2) possess an open mind so that he or she may fairly and impartially consider the evidence and render a verdict thereon. *Bristow, supra.* As far as is shown by the record, Ms. Torbit possessed both these virtues and was otherwise not disqualified by any statute. Therefore, the trial judge was not obliged to discharge her as a juror, and he did not abuse his discretion in denying Owens–Corning's motion for new trial.

### III. *DID THE TRIAL JUDGE ERR IN ORDERING OWENS–CORNING TO PRODUCE CERTAIN DOCUMENTS?*

The trial court ordered Owens–Corning to produce several documents that Owens–Corning contended were either work product or protected by the attorney/client privilege. After receipt of these materials, the City read into the record, at trial, a portion of one of these documents. In its brief Owens–Corning states that it does not

> argue that trial court's error in allowing the City to read one of these documents into the record is sufficient to require a new trial.... [It] raises this issue on appeal [only] to obtain a ruling that these documents constitute protected work product and attorney/client communications and to preclude the protection and entry into evidence of these documents on remand in this case and in other proceedings.

This Court does not decide purely academic questions. The documents have already been produced. There will be no remand for a new trial, and Owens–Corning has directed us to no "other proceedings" in which the documents might be used.

### IV. *MAY PUNITIVE DAMAGES BE AWARDED IN A NON–INTENTIONAL TORT CASE INVOLVING ONLY PROPERTY LOSS?*

This interesting question need not be decided in light of our holding in Part I that the trial judge erred in failing to grant

32

Owens–Corning's motion for judgment on the issue of punitive damages.

**V.** ***MAY AN AWARD OF PUNITIVE DAMAGES STAND AGAINST OWENS–CORNING IN LIGHT OF THE JURY'S CONFLICTING VERDICT THAT OWENS–CORNING WAS NOT NEGLIGENT IN FAILING TO TEST FOR OR WARN OF THE DANGERS OF ITS PRODUCT?***

This question, like Question No. IV, need not be decided in view of our answer to Question No. I.

**JUDGMENT AGAINST OWENS–CORNING FIBERGLAS CORPORATION AWARDING PUNITIVE DAMAGES IN FAVOR OF THE MAYOR AND CITY COUNCIL OF BALTIMORE REVERSED; JUDGMENT AGAINST OWENS–CORNING FIBERGLAS CORPORATION AWARDING COMPENSATORY DAMAGES IN FAVOR OF THE MAYOR AND CITY COUNCIL OF BALTIMORE AFFIRMED; COSTS TO BE PAID 50% BY OWENS–CORNING FIBERGLAS CORPORATION AND 50% BY MAYOR AND CITY COUNCIL OF BALTIMORE.**